UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MANTISSA CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | 19 C 3204 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| FISERV SOLUTIONS, LLC, and FISERV, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Mantissa Corporation brought this suit against FiServ Solutions, LLC, and Fiserv, Inc. (together, "Fiserv"), alleging infringement of U.S. Patent No. 9,361,658 ("'658 Patent"). Doc. 21. Consistent with Local Patent Rule 4.1(b), the parties selected six disputed claim terms and briefed the disputes under Local Patent Rule 4.2. Docs. 41, 44, 46, 48-49. (The parties agreed to be bound by the court's construction in a related case, *Mantissa Corp. v. First Financial Corp.*, 17 C 9174 (N.D. Ill.), of two other disputed terms in the '658 Patent. Doc. 41.) The parties then presented argument based on their briefs and supporting documentary evidence without introducing any testimony. Doc. 63; *see* N.D. Ill. L.P.R. 4.3. Having considered the parties' submissions, the court construes the disputed terms.

### Background

#### A.    The '658 Patent

The '658 Patent, titled "System and Method for Enhanced Protection and Control Over the Use of Identity," describes a method that allows users to protect their identity by placing conditions on financial transactions—which must be satisfied for the transaction to proceed—without exposing sensitive identification information to third parties. Doc. 45-1. Mantissa alleges that Fiserv's software application CardValet, a "debit and credit card fraud mitigation and

1

management system that enables cardholders to control when, where and how their debit and credit cards are used," infringes the '658 Patent.  Doc. 21 at ¶¶ 22-38.  Specifically, Mantissa alleges that CardValet infringes nine of the Patent's claims, three independent (1, 7, and 13) and six dependent (3, 8, 10, 11, 12, and 15).  *Id*. at ¶ 26; Doc. 46 at 6; *see Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1367 (Fed. Cir. 2012) ("It is axiomatic that a dependent claim cannot be broader than the [independent] claim from which it depends.") (citing 35 U.S.C. § 112).

The nine claims, with the disputed terms in bold, read as follows:

**Table 1.  Independent Claims**

| Claim | Text |
|---|---|
| 1 | A method for a **service provider** to control use of an entity's financial account to facilitate transactions, comprising:<br><br>**setting** scope of use, defined by the entity via a **network**, for the financial account, including at least:<br>(a) the financial account to either OFF or ON;<br>(b) for a plurality of individual categories, whether each category is authorized or unauthorized for transactions using the financial account, each category representing a different type of transaction partner; and<br>(c) a geographical scope reflecting a geographic area in which transactions are authorized;<br><br>**receiving**, via a **network** from a **source** other than the entity, an inquiry regarding a proposed transaction that would use the financial account;<br><br>**determining**, relative to the scope of use, whether the financial account may or may not be used for the proposed transaction, comprising:<br>denying when the financial account is OFF;<br>denying when the financial account is ON and the proposed transaction falls within a category that is unauthorized;<br>denying when the financial account is ON, the proposed transaction falls within a category that is authorized and when a location of the proposed transaction is outside of the geographical area;<br>permitting when (a) the financial account is ON, (b) the proposed transaction falls within a category that is authorized, (c) a location of the proposed transaction is inside the geographical area, and (d) the proposed transaction is not otherwise impermissible; and |

| | |
|---|---|
| | **responding to the inquiry by providing, via a network to the source, first information** based on the result of the determining. |
| 7 | A method for a **service provider** to control use of an entity's financial account to facilitate transactions, the method being executed on electronic computer hardware in combination with software, the method comprising:<br><br>**setting** scope of use, as defined by the entity via a **network**, for the financial account, including at least:<br>(a) **setting** a state status of the financial account to either an OFF or ON state;<br>(b) **setting** a category status for each category of a plurality of categories as either authorized or unauthorized for transactions using the financial account, each category representing a type of transaction partner; and<br>(c) **setting** a distance from the entity, where the entity's financial account can be used within said distance;<br><br>**receiving**, via a **network** from a **source** other than the entity, an inquiry regarding a proposed transaction on the financial account;<br><br>**determining**, relative to the scope of use, a response status to the inquiry reflecting whether the financial account may or may not be used for the proposed transaction, comprising:<br>**setting** the response status to impermissible when the state status for the financial account is OFF;<br>**setting** the response status to impermissible when the state status for the financial account is ON and the proposed transaction falls within a category having an unauthorized category status;<br>**setting** the response status to impermissible when the state status for the financial account is ON, the proposed transaction falls within a category having an authorized category status and the distance from the entity where the entity's financial account can be used is outside said distance;<br>**setting** the response status to permissible when (a) the state status of the financial account is ON, (b) the proposed transaction falls within a category having an authorized category status, (c) the distance from the entity where the entity's financial account can be used is within said distance, and (d) the proposed transaction is not otherwise impermissible; and<br><br>**responding to the inquiry by providing, via a network to the source, first information** based on the response status of the determining. |
| 13 | A method of protecting use of an entity's financial account, the method being executed on electronic computer hardware in combination with software, the method comprising:<br><br>storing data representing:<br>first identification information of an entity; and |

| | |
|---|---|
| | at least one criteria previously defined by the entity for allowing and/or limiting the use of the financial account, the at least one criteria defining at least one non-monetary circumstance under which the financial account can be used;<br><br>**receiving**, via a **network** from a **source** other than the entity, a request to determine whether a proposed use of the entity's financial account by a party at a location is allowable, the request including second identification information;<br><br>**comparing** at least some of the first identification information with at least some of the second identification information;<br><br>**determining** whether the proposed use of the entity's financial account by the party at the location is authorized for the proposed use, comprising:<br>    **determining** whether the entity's financial account is in an entity established ON or OFF state;<br>    **determining** whether or not the at least one criteria blocks the proposed use, with the at least one criteria blocks comprising at least one of:<br>        a geographical limitation on where the financial account can be used; and<br>        a distance from the entity within which the financial account can be used; and<br><br>**responding to the request by providing, via a network to the source, response information** based on the result of said determining. |

Doc. 45-1 at 17-18.

**Table 2. Dependent Claims**

| Claim | Text |
|---|---|
| 3 | The method of claim 1, wherein the entity's financial account has an assigned code, the method further comprising:<br><br>the receiving the inquiry comprises receiving only a portion of the assigned code;<br><br>wherein the entire assigned code is needed to execute the proposed transaction, such that **service provider**'s possession of only the portion of the assigned code is alone insufficient to allow the **service provider** to fraudulently execute other transactions. |
| 8 | The method of claim 7, wherein the contents of the inquiry is insufficient to allow the **service provider** to execute the proposed transaction, such that the **service provider** could not use the contents of the inquiry alone to fraudulently execute other transactions. |
| 10 | The method of claim 7, wherein the financial account is a credit card account or debit card account. |

| 11 | The method of claim 7, wherein the scope of use further comprise a geographic scope reflecting a geographic area in which transactions are authorized, and the determining further comprises **setting** the response status to impermissible when a location of the proposed transaction is outside of the geographic area. |
|----|----|
| 12 | The method of claim 7, further comprising: <br><br> receiving second information representing the entity's desired scope of use of the financial account, and <br><br> wherein the scope of use is defined by the received second information. |
| 15 | The method of claim 7, wherein: <br><br> the **setting** scope of use further includes (c) setting geographic limitations on where the financial account can be used; and <br><br> wherein a proposed transaction that originates outside of the geographic limitations is considered impermissible for the determining. |

*Id.* at 17-18.

The Patent and Trademark Office ("PTO") granted the '658 Patent to its inventors, Gary and Sharon Dennis, on June 7, 2016. *Id.* at 2. The '658 Patent is a division of U.S. Patent No. 8,719,953, issued on May 6, 2014, as a division of U.S. Patent No. 8,353,027 ("'027 Patent"), issued on January 8, 2013, as a continuation of U.S. Patent No. 7,779,456 ("'456 Patent"), issued on August 17, 2010. *Ibid.*; *see Transco Prods. Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 555 (Fed. Cir. 1994) ("'Continuation' and 'divisional' applications are … both continuing applications based on the same disclosure as an earlier application. They differ, however, in what they claim. A 'continuation' application claims the same invention claimed in an earlier application, although there may be some variation in the scope of the subject matter claimed. A 'divisional' application, on the other hand, is one carved out of an earlier application which disclosed and claimed more than one independent invention, the result being that the divisional application claims only one or more, but not all, of the independent inventions of the earlier application.") (internal citations omitted). The '658 Patent

claims priority to the earlier patents' applications, the earliest of which was filed on April 27, 2005.  Doc. 45-1 at 2.

The '658 Patent states that the "present invention provides protection of the identity of an entity by placing limitations or conditions on its use, and whereby the entity's use-enabling identification information is not fully needed to authorize a transaction."  *Id*. at 10 (1:22-25).  The Patent explains that, before the invention, "[t]raditional responses" and existing solutions to the problem of identity theft, which commonly involved "monitoring the use of identity resources and notifying a consumer after detection of an unusual use of the identity," were "inadequate."  *Ibid*. (1:51-54).  To "improve security of identification information," the Patent teaches a method that allows an "identity owner" to "proactively control[] use of his identity and identification information" by setting conditions on his identity's use.  *Ibid*. (2:8-16).  For example, an identity owner could specify that "credit cards can only be used between 9 AM and 11 PM[,] medical information is available at all times but only to users that are pre-authorized for health services (e.g., doctors, hospitals, pharmacies)[,] [and] applications for loans or new credit are never to be approved."  *Id*. at 12 (5:48-55).  Such conditions "establish default and real-time use control over the identity of an identity owner," as the conditions may be modified "on a whim, creating a real-time, or near real-time system that is fluid a[n]d constantly capable of meeting the needs of [the] identity owner while securing the identification information."  *Ibid*. (5:56-6:3).

The method taught by the Patent is enabled by an intermediary entity, the "service provider," that mediates between the "identity owner" and a "user"—with the "user" being an entity that would like to access the identity owner's records or authorization, such as a "credit card company, credit reporting agency, merchant, banking institution, brokerage firm, insurance

provider, hospital, medical caregiver, computer, corporation, or family member," or "an imposter." *Id*. at 11, 13 (4:40-65; 8:18-23). First, the identity owner provides the service provider with information and conditions authorizing, limiting, or denying use of her identity. *Id*. at 11 (4:48-51). Sometime later, an attempt to use the identity owner's identity is made at a "source" and communicated to the user. *Ibid*. (4:52-55). The user then communicates the identity use request to the service provider via a "network," and the service provider determines whether to authorize the request by comparing it to the identity owner's preset conditions. *Ibid*. (4:58-61). In the method's "preferred embodiment," the identity use request includes "enough information to allow [the] service provider to locate the account information of the particular identity owner and to determine the corresponding user instructions," but is "in and of itself insufficient to enable the use of the identity for its intended use, such that its capture or loss would not expose vital information." *Id*. at 11-12 (4:66-5:6).

The Patent specifies that the service provider "preferably is a company that includes employees that operate the necessary computer hardware and software to secure identification information and to communicate with identity owners and users. In an alternative embodiment, [the] service provider is an automated combination of hardware and software." *Id*. at 13 (7:51-56). The service provider "could just as well be a credit reporting agency, insurance agency, health agency, or any established entity that has been enabled to practice the invention." *Id*. at 14 (9:21-24). In addition, the "network" by which the source, user, and service provider communicate "may take the form of voice communication (e.g., through telephony or by face-to-face encounter) or an electronic interconnection such as an Internet or intranet Web browser interface, or any wireless or direct interface assisted by a software component such as a client-side application." *Id*. at 13 (9:25-31).

**B.      The '456 and '027 Patents and the *Ondot* Claim Construction**

As noted, the '658 Patent is related to two older patents, the '456 and '027 Patents.  *Id.* at 2.  Like the '658 Patent, the '456 and '027 Patents are titled "System and Method for Enhanced Protection and Control Over the Use of Identity," and all three share the same specification and figures.  *Id.* at 2-17; U.S. Patent No. 7,779,456 (filed Apr. 27, 2005); U.S. Patent No. 8,353,027 (filed Jul. 26, 2010).  And like the '658 Patent, the '456 and '027 Patents describe an invention that "provides protection of the identity of an entity by placing limitations or conditions on its use, and whereby the entity's use-enabling identification information is not fully needed to authorize a transaction."  '456 Patent at 1:10-14; '027 Patent at 1:17-20.  Unlike the '658 Patent's claims, however, the independent claims in the '456 and '027 Patents do not specify that the claimed method controls "use of an entity's financial account."  Doc. 45-1 at 17-18 (15:20-21, 16:12-13, 17:13-14).  Rather, the independent claims in the '456 and '027 Patents describe the same general method described in the '658 Patent—in which a "service provider" receives "information regarding the attempted use of the entity's identity, the information being insufficient in and of itself to execute the attempted use of the identity," and determines whether to authorize the attempted use based on "at least one pre-registered condition," '027 Patent at 15:18-35—but do not limit the method to financial transactions.

In April 2015, Mantissa sued Ondot Systems, Inc., the company that supplied the CardValet software to Fiserv, Doc. 44 at 5, in the Southern District of Texas, alleging infringement of the '456 and '027 Patents.  *Mantissa Corp. v. Ondot Sys., Inc.*, 2017 WL 1373771, at *1 (S.D. Tex. Jan. 13, 2017), *report and recommendation adopted*, 2017 WL 1383884 (S.D. Tex. Apr. 13, 2017), *aff'd*, 796 F. App'x 738 (Fed. Cir. 2020).  The *Ondot* court construed ten terms in the '456 and '027 Patents.  *Id.* at *3.  Relevant here, the parties in *Ondot*

agreed that the term "source" should be construed as "a person or thing from which the inquiry comes into being or is derived or obtained." *Ibid*.

By contrast, the parties in *Ondot* disputed the construction of the term "service provider": Mantissa proposed to construe the term as "that which addresses requests for identity use," while Ondot argued that no construction was needed. *Ibid*. The *Ondot* court adopted Mantissa's proposed construction, reasoning that it was "consistent with the language of the relevant claims," which described a method that includes "requesting use of the identity" in which a "user of said identity [transmits] to a service provider … a request for authorization to use the identity." *Ibid*. The court explained that this claim language "shows [that] the function of a 'service provider' is to 'address' (i.e., deal with) requests for identity use." *Id*. at *4.

### C. The Disputed Claim Terms

Mantissa and FiServ dispute six claim terms and propose the following constructions:

**Table 3. Disputed Claim Terms**

| Claim Term | Mantissa's Proposal | Fiserv's Proposal |
|---|---|---|
| "service provider" (claims 1, 3, 7, 8) | "Third-party authorization processor having computer(s) that, as required by the claims, (i) is connected between an entity and a financial institution, such as a bank, that hosts a financial account of the entity, (ii) receives via a real-time computerized transaction processing network, from a source, such as a merchant, an 'inquiry' or 'request' regarding a proposed transaction that would use the financial account, (iii) determines whether the financial account may or may not be used for the proposed transaction, and (iv) responds directly or indirectly to the source via the network." | The term "service provider" was previously construed in *Mantissa Corp. v. Ondot Sys., Inc*., 2017 WL 1373771, at *3 (S.D. Tex. Jan. 13, 2017), as "that which addresses requests for identity use." |

| "source" (claims 1, 7, 13) | "Relying party or location, such as a merchant, at which a transaction that would use the financial account is proposed or at which a use of the entity's financial account is proposed." | The term "source" was previously construed in *Mantissa Corp. v. Ondot Sys., Inc.*, 2017 WL 1373771, at *3 (S.D. Tex. Jan. 13, 2017), as "a person or thing from which the inquiry comes into being or is derived or obtained." |
|---|---|---|
| "network" (claims 1, 7, 13) | "Real-time computer network." Alternative: "Network including a real-time computer network." | (a) No construction is required. (b) Mantissa's proposed construction would render the term indefinite. |
| In each asserted claim, the first-level claim steps of "receiving," "comparing" (claim 13 only), "determining," and "responding" | "Each claim step is performed in real-time or near-real-time and using computer communication network protocols." Alternative: "Each claim step is performed together in real-time and using computer communication network protocols." | (a) No construction is required. (b) Mantissa's proposed construction would render the term indefinite. |
| "setting" (claims 1, 7, 11, 15) | "Storing in the computer(s) of the service provider." | No construction is required. |
| "responding to the inquiry/request by providing, via a network to the source, first/response information" (claims 1, 7, 13) | "Sending first/response information directly or indirectly via a network to the source." | No construction is required. |

Doc. 49 at 1-2; Doc. 46 at 23.

The parties agree to the construction of the following claim term:

**Table 4.  Agreed Claim Term**

| Claim Term | Agreed Construction |
|---|---|
| In each asserted claim, the first-level claim steps of "setting" (or "storing" in claim 13), "receiving," "comparing" (claim 13 only), "determining," and "responding" | Each claim step is performed by execution on computer(s) of the "service provider" and in the order stated in the claim. |

Doc. 49 at 1.

## Discussion

A patent gives the patentee the temporary "right to exclude others from making, using, offering for sale, or selling the patented invention." *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 638 (Fed. Cir. 2015) (alteration omitted) (quoting 35 U.S.C. § 154). The scope of the patented invention is determined by the patent's claims—short statements describing what others cannot do without the patentee's consent. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) ("It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.") (internal quotation marks omitted). A court hearing a patent infringement suit must construe the patent's claims, both to settle disputes about their scope and to translate technical terms into concise definitions that jurors can understand. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[C]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.") (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)); *AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1247 (Fed. Cir. 2001) ("[T]he claim construction becomes the basis of the jury instructions, should the case go to trial."). Claim construction is a question of law, although it may require the court to make "subsidiary factual findings." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331-32 (2015); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388 (1996) ("[J]udges, not juries, are the better suited to find the acquired meaning of patent terms."); *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346 (Fed. Cir. 2015).

"Claim construction must begin with the words of the claims themselves," with the meaning of those words "generally" depending on the "'ordinary and customary meaning' that

they 'would have to a person of ordinary skill in the art … in question at the time of the invention.'" *Endo Pharm. Inc. v. Actavis LLC*, 922 F.3d 1365, 1370 (Fed. Cir. 2019) (quoting *Phillips*, 415 F.3d at 1312-13) (alteration and first set of internal quotation marks omitted); *see also E.I. du Pont de Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1068 (Fed. Cir. 2019) ("The purpose of claim construction is to give meaning to the claim terms according to how a person of ordinary skill in the art would have understood them at the time of the invention in light of the entire patent, including the claims in which the terms appear and the specification."). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001) (noting that claim terms that "are not technical terms of art" generally "do not require elaborate interpretation"). If a term's meaning is not readily apparent to a generalist, the court must consult "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Phillips*, 415 F.3d at 1314 (internal quotation marks omitted); *see also Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019) ("[D]istrict courts give claims their ordinary and customary meaning, which is 'the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.'") (quoting *Phillips*, 415 F.3d at 1312-13); *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016) (cautioning that "a word describing patented technology takes its definition from the context in which it was used by the inventor" and cannot be construed "in a vacuum") (internal quotation marks omitted); *O2*, 521 F.3d at 1361 ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary

meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute.").

Publicly available sources fall into two categories: "intrinsic evidence" and "extrinsic evidence." *Endo*, 922 F.3d at 1371 (quoting *Teva*, 574 U.S. at 331). Intrinsic evidence comprises the patent itself and the official records of its creation, including "the words of the claims themselves, the remainder of the specification, [and] the prosecution history." *Cont'l Circuits*, 915 F.3d at 796 (quoting *Phillips*, 415 F.3d at 1314); *see also Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*, 878 F.3d 1336, 1341 & n.5 (Fed. Cir. 2018) (explaining that "[a] specification includes both the written description and the claims of the patent" and that "[a] patent's prosecution history consists of the complete record of the proceedings before" the PTO) (internal quotation marks omitted). Intrinsic evidence is the most important evidence of a term's meaning. *See E.I. du Pont*, 921 F.3d at 1068 ("[I]t is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record.") (internal quotation marks omitted); *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1195 (Fed. Cir. 2013) ("When construing claim terms, we first look to, and primarily rely on, the intrinsic evidence, including the prosecution history and the specification—which is usually dispositive."). In particular, "'[t]he specification is *always* highly relevant to the claim construction analysis' and is, in fact, 'the single best guide to the meaning of a disputed term.'" *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016) (quoting *Phillips*, 415 F.3d at 1320); *see also Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1043 (Fed. Cir. 2019) ("[T]he specification is the single best guide to the meaning of a disputed term and usually, it is dispositive.") (alteration and internal quotation marks omitted); *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 822 (Fed. Cir. 2016) (similar). That said, a court must take care to "avoid importing limitations from

13

the specification into the claims." *Imaginal Systematic, LLC v. Leggett & Platt, Inc.*, 805 F.3d 1102, 1109 (Fed. Cir. 2015) (quoting *Phillips*, 415 F.3d at 1323); *see also Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("While we read claims in view of the specification, of which they are a part, we do not read limitations from the embodiments in the specification into the claims."). A construction based solely on intrinsic evidence is a legal conclusion, not a factual finding. *See Teva*, 574 U.S. at 331 ("[W]hen the district court reviews only evidence intrinsic to the patent …, the judge's determination will amount solely to a determination of law … .").

Extrinsic evidence is evidence from outside the intrinsic record that "shed[s] useful light on the relevant art," including "expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (internal quotation marks omitted); *see also Cont'l Circuits*, 915 F.3d at 796 (explaining that "extrinsic evidence" can help explain "relevant scientific principles, the meaning of technical terms, and the state of the art") (internal quotation marks omitted). Although the court "may consider extrinsic evidence in claim construction, such evidence is generally of less significance than the intrinsic record." *Endo*, 922 F.3d at 1371 (internal quotation marks omitted); *see also H-W Tech., LC v. Overstock.com, Inc.*, 758 F.3d 1329, 1332 (Fed. Cir. 2014) ("After considering … intrinsic evidence, a court may also seek guidance from extrinsic evidence such as expert testimony, dictionaries, and treatises."); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1360 (Fed. Cir. 2013) ("Where the intrinsic record is ambiguous, and when necessary, we have authorized district courts to rely on extrinsic evidence … ."). It follows that "[e]xtrinsic evidence may not be used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'" *Wi-Lan, Inc. v. Apple Inc.*, 811 F.3d 455, 462 (Fed. Cir. 2016) (quoting *Phillips*, 415 F.3d at 1324). A

court relying on extrinsic evidence may need to make "subsidiary factual findings," such as in resolving a dispute about what a person with ordinary skill in the art would have understood a term of art to mean at the time of the invention. *Teva*, 574 U.S. at 331-32. After making that fact determination, however, the court must make the legal decision about what the term means "in the context of the specific patent claim under review." *Id*. at 332 (emphasis omitted).

The court proceeds to construe the disputed claim terms. *See AFG Indus.*, 239 F.3d at 1247 ("It is critical for trial courts to set forth an express construction of the material claim terms in dispute, in part because the claim construction becomes the basis of the jury instructions, should the case go to trial. It is also the necessary foundation of meaningful appellate review.") (citation omitted). The court need not choose the better of two incorrect constructions proposed by the parties; rather, the court "has an independent obligation to determine the meaning of the claims, notwithstanding the views asserted by the adversary parties." *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995) (noting that "[t]he pursuit of that obligation in this case would have resulted in a determination that [one party's] preferred claim interpretation is incorrect, and that [the other party's] is only partly correct"); *see also Bancorp Servs., LLC v. Sun Life Assurance Co.*, 687 F.3d 1266, 1274 (Fed. Cir. 2012) ("[A] district court may construe the claims in a way that neither party advocates … ."); *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1323-24 (Fed. Cir. 2008) ("Because the court has an independent obligation to construe the terms of a patent, we need not accept the constructions proposed by either party … .").

## I. "Service provider" (claims 1, 3, 7, and 8) and "Source" (claims 1, 7, and 13)

Mantissa proposes construing the term "service provider" as a "third-party authorization processor having computer(s) that, as required by the claims, (i) is connected between an entity and a financial institution, such as a bank, that hosts a financial account of the entity, (ii) receives

15

via a real-time computerized transaction processing network, from a source, such as a merchant, an 'inquiry' or 'request' regarding a proposed transaction that would use the financial account, (iii) determines whether the financial account may or may not be used for the proposed transaction, and (iv) responds directly or indirectly to the source via the network," Doc. 46 at 9, and the term "source" as the "relying party or location, such as a merchant, at which a transaction that would use the financial account is proposed or at which a use of the entity's financial account is proposed," *id*. at 25. Fiserv contends that Mantissa's proposed constructions are precluded by collateral estoppel because both terms have "already been construed in" the *Ondot* case. Doc. 44 at 12-13. Fiserv adds that, even if collateral estoppel does not apply, the court should adhere to the presumption that "the same claim term in the same patent or related patents carries the same construed meaning" and construe "service provider" and "source" as the *Ondot* court did. *Id*. at 14 (quoting *Omega Eng'g, Inc. v. Raytek Corp*., 334 F.3d 1314, 1334 (Fed. Cir. 2003)).

### A. "Service provider"

"Under the doctrine of collateral estoppel, … 'once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.'" *Firishchak v. Holder*, 636 F.3d 305, 308 (7th Cir. 2011) (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)). Because the "criteria of collateral estoppel are not unique to patent issues," a court's collateral estoppel analysis in patent cases is "guided by" regional circuit precedent. *Aspex Eyewear, Inc. v. Zenni Optical Inc*., 713 F.3d 1377, 1380 (Fed. Cir. 2013). "However, for any aspects that may have special or unique application to patent cases, Federal Circuit precedent is applicable." *Ibid*.

Under Seventh Circuit precedent, collateral estoppel has four elements: "(1) the issue sought to be precluded is the same as an issue in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; (3) the determination of the issue must have been essential to the final judgment; and (4) the party against whom estoppel is invoked must have been fully represented in the prior action." *Adams v. City of Indianapolis*, 742 F.3d 720, 736 (7th Cir. 2014). Federal Circuit precedent governs the first element, as "the question whether a particular claim in a patent case is the same as or separate from another claim has special application to patent cases." *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc*., 672 F.3d 1335, 1341 n.1 (Fed. Cir. 2012); *see also Nestle USA, Inc. v. Steuben Foods, Inc*., 884 F.3d 1350, 1351 (Fed. Cir. 2018) ("We apply our precedent on collateral estoppel when claim construction is involved."). As Federal Circuit precedent understands the first element, "collateral estoppel is not limited 'to patent claims that are identical. Rather, it is the identity of the *issues* that were litigated that determines whether collateral estoppel should apply.'" *Nestle*, 884 F.3d at 1351. If there is no "material difference between the two patents or their prosecution histories that would give rise to claim construction issues in th[e] [present suit] different from those raised in the prior [suit]," the first element is satisfied. *Id*. at 1352.

Fiserv argues that because the '456 and '027 Patents "pertain to the same art, are in the same family as, and share much of their specifications with the '658 patent[,] [t]he construction of the claim terms 'service provider' and 'source' in the '658 patent are," for collateral estoppel purposes, "the same issues as were fully and fairly litigated in *Ondot*." Doc. 44 at 13. True enough, all three patents share the same title, specification, and figures, and they all describe an invention that "provides protection of the identity of an entity by placing limitations or conditions on its use, and whereby the entity's use-enabling identification information is not

fully needed to authorize a transaction." Doc. 45-1 at 10 (1:22-25) ['658 Patent]; '027 Patent at 1:17-20; '456 Patent at 1:10-14. However, the '658 Patent's claims are expressly limited to methods for "control[ling] use of an entity's *financial account* to facilitate transactions." Doc. 45-1 at 17 (15:20-21) (emphasis added); *see also ibid*. (16:13-14) (Claim 7: "A method for a service provider to control use of an entity's financial account to facilitate transactions … ."); *id*. at 18 (17:13-14) (Claim 13: "A method of protecting use of an entity's financial account … ."). By contrast, the independent claims of the '456 and '027 Patents more broadly describe "[a] method of protecting use of an entity's identity" and do not mention the term "financial account." '456 Patent at 15:8-9; '027 Patent at 15:18-19.

Importantly, the *Ondot* court's construction of the term "service provider" to mean "that which addresses requests for *identity use*," *Ondot*, 2017 WL 1373771, at *3 (emphasis added), is keyed to the description in the '456 and '027 Patent claims of "[a] method of protecting *use of an entity's identity*" (emphasis added), a phrase that does not appear in the '658 Patent claims. Because the '658 Patent claims describe a method that focuses exclusively on "use of an entity's financial account to facilitate transactions," and do not mention the phrase "use of an entity's identity," the *Ondot* court's construction—in particular, its focus on "identity use"—is more likely to confuse than to elucidate a jury in this case and therefore is an unsuitable construction here. *See Avid Tech., Inc. v. Harmonic, Inc*., 812 F.3d 1040, 1050 (Fed. Cir. 2016) ("[T]he aim of claim construction [is] to give the finder of fact an understandable interpretation of claim scope to apply … ."); *Sulzer Textil A.G. v. Picanol N.V*., 358 F.3d 1356, 1366 (Fed. Cir. 2004) (holding that the purpose of claim construction is to "instruct the jury on the meanings to be attributed to all disputed terms used in the claims in suit so that the jury will be able to intelligently determine the questions presented") (internal quotation marks omitted). It follows

18

that the absence of the phrase "use of an entity's identity" in the '658 Patent claims is a "material difference" between the '658 Patent, on the one hand, and the '456 and '027 Patents, on the other, that "give[s] rise to claim construction issues in th[e] [present suit] different from those raised in the prior [suit]," and therefore that collateral estoppel does not govern construction of the term "service provider" in the '658 Patent. *Nestle*, 884 F.3d at 1352.

The court nonetheless must respect the Federal Circuit's direction to "presume, unless otherwise compelled, that the same claim term in … related patents carries the same construed meaning." *Omega*, 334 F.3d at 1334. Granted, the *Ondot* court's construction of the term "service provider" in the '456 and '027 Patents does not by way of collateral estoppel govern the meaning of "service provider" in the '658 Patent given that the '658 Patent replaces the phrase "identity use," used in the '456 and '027 Patents, with the phrase "use of an entity's financial account." Doc. 45-1 at 17-18 (15:20-21, 16:13-14, 17:13-14); *see also* Doc. 48 at 4 (stating that the "corresponding limitation in the claims of the '658 Patent" to the phrase "use of identity" in the '456 and '027 Patents is the phrase "use of an entity's financial account"). Still, consistent with the Federal Circuit's direction in *Omega*, the court will retain the essence of the *Ondot* court's construction while giving effect to the different language used in the '658 Patent. Doing so results in the phrase "identity use" in the *Ondot* construction being replaced with the phrase "use of an entity's financial account" to yield the following construction of the term "service provider" in the '658 Patent: "that which addresses requests for use of an entity's financial account."

Mantissa's proposed construction for the term "service provider" is: "third-party authorization processor having computer(s) that, as required by the claims, (i) is connected between an entity and a financial institution, such as a bank, that hosts a financial account of the

entity, (ii) receives via a real-time computerized transaction processing network, from a source, such as a merchant, an 'inquiry' or 'request' regarding a proposed transaction that would use the financial account, (iii) determines whether the financial account may or may not be used for the proposed transaction, and (iv) responds directly or indirectly to the source via the network." Doc. 46 at 9. That proposed construction is no improvement over the modified construction from *Ondot*; to the contrary, it improperly imports limitations from the specification and from other claims, and it is unsupported by intrinsic or extrinsic evidence.

The parties agree that the service provider *has* computers on which the first-level claim steps of "setting," "storing," "receiving," "comparing," "determining," and "responding" are performed, Doc. 49 at 1, and they clarified at the claim construction hearing that their dispute as to Mantissa's proposed construction of "service provider" concerns whether the service provider *itself* is a computer. To support its position that a service provider is a computer authorization processor, Mantissa observes that the specification states that the "[s]ervice provider preferably is a company that includes employees that operate the necessary computer hardware and software to secure identification information and to communicate with identity owners and users. In an alternative embodiment, [the] service provider is an automated combination of hardware and software that carries out the operations described herein." Doc. 45-1 at 13 (7:51-57); Doc. 46 at 12-13. Mantissa's submission fails to persuade. The fact that a preferred embodiment of the service provider is "a company *that includes employees* that operate the necessary computer hardware and software" means that the service provider can have employees as well as computers. Doc. 45-1 at 13 (7:51-53). Moreover, the fact that one embodiment of the service provider described in the specification is "an automated combination of hardware and software" does not limit the term "service provider" to a computer processor because, as noted,

courts "may not read a limitation into a claim from the specification." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) ("[P]articular embodiments appearing in the written description will not be used to limit claim language that has broader effect."); *see also Imaginal Systematic*, 805 F.3d at 1109 ("[I]t is important to avoid importing limitations from the specification into the claims.") (internal quotation marks omitted); *Hill-Rom Servs.*, 755 F.3d at 1371 ("While we read claims in view of the specification, of which they are a part, we do not read limitations from the embodiments in the specification into the claims."); *Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

Mantissa argues further that the term "service provider" must refer to a computer because claims 7 and 13 recite a method that is "executed on electronic computer hardware in combination with software." Doc. 45-1 at 17-18 (16:13-16, 17:12-14); Doc. 46 at 13. But claim 1, which recites "[a] method for a service provider to control use of an entity's financial account to facilitate transactions," does not have that limitation. Doc. 45-1 at 17 (15:20-22). Accordingly, the computer limitation from claims 7 and 13 does not limit the meaning of "service provider" given that the same term appears in claim 1. *See Caterpillar Tractor Co. v. Berco, S.P.A.*, 714 F.2d 1110, 1116 (Fed. Cir. 1983) ("Courts may not introduce into a claim limitations which are explicitly contained in other claims.").

As for extrinsic evidence, Mantissa submits a declaration of Gary Dennis, one of the co-inventors, averring that, as a person of ordinary skill in the art, a "general meaning of 'service provider' in the field of computerized financial transaction networks at the time of the invention of the ['658] Patent is: a third-party computerized processing or routing service or device."

Doc. 46 at 10. In support, Dennis cites two industry references from the time of the invention: "A Guide to the ATM and Debit Card Industry," published by the Federal Reserve Bank of Kansas City in 2003; and the "Glossary of the Payment Card Industry Data Security Standard," an industry consortium and standard established in 2004. Neither reference supports Dennis's purported understanding of the term "service provider."

The Guide states that service providers comprise both "third-party processors *and* independent sales organizations" and lists "authorization services" as one of "six major types of activities" that third-party processors provide. Doc. 46 at 10 (emphasis added). As understood by the Guide, "service provider" describes a broader set of entities than merely a "third-party computerized processing or routing service or device." For its part, the Glossary defines "service provider" as a "business entity … directly involved in the processing, storage, or transmission of cardholder data on behalf of another entity." *Id*. at 11. That definition undermines Mantissa's position, as "business entity" describes far more than a "computerized processing or routing service or device" and arguably does not describe it at all. Moreover, Dennis's testimony carries little weight in the claim construction process. *See Bell & Howell Document Mgmt. Prod. Co. v. Altek Sys*., 132 F.3d 701, 706 (Fed. Cir. 1997) ("The testimony of an inventor … concerning claim construction is [] entitled to little or no consideration. The testimony of an inventor often is a self-serving, after-the-fact attempt to state what should have been part of his or her patent application … .") (quoting *Markman*, 52 F.3d at 983).

In sum, neither the intrinsic nor the extrinsic evidence cited by Mantissa supports its proposed construction of "service provider" as a "[t]hird-party authorization processor having computer(s)." And the remainder of Mantissa's proposed construction does not define the term "service provider," but rather summarizes the description of the method set forth in the

22

remainder of the claims. *See Sulzer Textil*, 358 F.3d at 1366 (holding that the purpose of claim construction is to elucidate "the meanings to be attributed to all disputed terms used in the claims in suit"). Accordingly, the court adopts its proposed modified construction from *Ondot*—"that which addresses requests for use of an entity's financial account"—for the term "service provider" in the '658 Patent. *See Exxon*, 64 F.3d at 1555 ("[T]he trial judge has an independent obligation to determine the meaning of the claims, notwithstanding the views asserted by the adversary parties."); *Bancorp*, 687 F.3d at 1274 (similar); *Praxair*, 543 F.3d at 1323-24 (similar).

### B.    "Source"

As noted, Fiserv contends that Mantissa is collaterally estopped from advocating a construction of the term "source" different from the one it agreed to and the court adopted in *Ondot*, namely, "a person or thing from which the inquiry comes into being or is derived or obtained." *Ondot*, 2017 WL 1373771, at *3. Collateral estoppel applies here, as there is no "material difference" between the '027 and '456 Patents, on the one hand, and the '658 Patent, on the other, that would "give rise to claim construction issues" regarding the term "source" "in th[e] [present suit] different from those raised in the prior [suit]." *Nestle*, 884 F.3d at 1352. Just as in the '027 and '456 Patents, the "source" in the '658 Patent is an entity that generates the request addressed by the service provider. Doc. 45-1 at 17-18 (15:32-34, 16:28-30, 17:23-27) ['658 Patent]; '456 Patent at 16:7-9. It follows that the *Ondot* court's construction of "source"— "a person or thing from which the inquiry comes into being or is derived or obtained"—aptly describes the role that the "source" plays in the '658 Patent, in which the service provider receives and responds to "an inquiry regarding a proposed transaction that would use the financial account" generated from "a source." Doc. 45-1 at 17 (15:32-34, 16:28-30). Accordingly, collateral estoppel warrants adopting the *Ondot* court's construction of the term "source."

Mantissa argues that collateral estoppel does not apply because the broad construction of "source" that it agreed to in *Ondot* was "collapsed with [the term] 'entity' in an eligibility analysis in that litigation."  Doc. 46 at 27.  That argument fails, as "[p]atent terms do not vary as a result of an adversary's present or prior position as to what the claim words mean.  At the time the patent came into existence, the meaning of its claim terms became fixed."  *Advanced Magnetic Closure, Inc. v. Rome Fastener Corp.*, 2005 WL 1241896, at \*10 (S.D.N.Y. May 24, 2005).  That the construction of the term "source" to which Mantissa previously agreed resulted in the *Ondot* court invalidating the '456 and '027 Patents therefore provides no basis for evading collateral estoppel here.

Mantissa also argues that "[c]ollateral estoppel is [] inapplicable here because the [*Ondot*] decision … is not a 'final judgment' and may still be appealed."  Doc. 46 at 21.  The Federal Circuit affirmed the judgment in *Ondot* in March 2020, and the Supreme Court denied certiorari in December 2020.  *Mantissa Corp. v. Ondot Sys., Inc*., 796 F. App'x 738 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 899 (2020).  Accordingly, the *Ondot* judgment is final.

Even if collateral estoppel did not apply, the Federal Circuit's direction that a court should "presume, unless otherwise compelled, that the same claim term in … related patents carries the same construed meaning," *Omega*, 334 F.3d at 1334, counsels in favor of adopting the *Ondot* court's construction of "source."  That is especially so where, as here, the *Ondot* court's construction succinctly and accurately defines the term's meaning.  Accordingly, the court construes the term "source" to mean: "A person or thing from which the inquiry comes into being or is derived or obtained."

24

II.   **"Network" (claims 1, 7, and 13) and the first-level claim steps of "receiving," "comparing" (claim 13 only), "determining," and "responding" (claims 1, 7, and 13)**

Mantissa proposes construing the term "network" to mean a "real-time computer network" or, alternatively, a "network including a real-time computer network." Doc. 46 at 22-23. Relatedly, Mantissa proposes construing the first-level claim steps of "receiving," "comparing" (in claim 13 only), "determining," and "responding" in claims 1, 7, and 13 to mean being "performed in real-time or near-real-time and using computer communication network protocols" or, alternatively, being "performed together in real-time and using computer communication network protocols." *Id.* at 28. Fiserv maintains that any construction with the words "real-time" or "near-real-time" would render the terms indefinite under 35 U.S.C. § 112, and it contends that no construction of "network" or of the first-level claim steps is required. Doc. 44 at 15-17.

A.   **"Network"**

There are two problems with construing the term "network" to mean a "real-time computer network" or a "network including a real-time computer network."

First, nothing in the '658 Patent, its prosecution history, or Mantissa's briefs clarifies what a "real-time" network is. The parties agreed at the claim construction hearing that "real-time" does not literally mean "instantaneous," as even extremely fast processes take some amount of time. Yet at the hearing, Mantissa could not define "real-time" other than saying it means "pretty quickly."

Moreover, the '658 Patent mentions the term "real-time" only twice, in the context of a "non-limiting example" of the invention in the specification in which an identity owner sets up an account profile with a service provider that limits credit card use to the hours of 9 a.m. to 11 p.m., limits the disclosure of medical information to a list of pre-authorized parties, and

25

denies all applications for loans or new credit cards.  Doc. 45-1 at 12 (5:50-55).  The

specification states that "[l]imitations such as the above establish default and *real-time* use

control over the identity of an identity owner," as the identity owner can modify the account

profile "on a whim, creating a *real-time*, or near real-time system that is fluid a[n]d constantly

capable of meeting the needs of [the] identity owner." *Id*. at 12 (5:56-6:3) (emphases added).  In

that context, "real-time" conveys that the identity user's default account settings can be modified

at the user's convenience.  But nothing in the specification or the prosecution history indicates

how fast a process must be in order to be "pretty quick" or to be convenient to the identity user.

Given the lack of clarity on what "real-time" means, Mantissa's proposed construction confuses

rather than clarifies the meaning of "network."  *See AstraZeneca AB v. Mylan Pharms. Inc*., 19

F.4th 1325, 1342 (Fed. Cir. 2021) (Taranto, J., dissenting in part) ("One problem with [the

party's] proposed … construction is that, without additional precision, it actually adds to the

uncertainty of claim scope compared to the ordinary meaning.  Such a construction works

against the core purpose of claim construction, which is to *clarify* claim scope."); *Paragon Sols.,

LLC v. Timex Corp*., 566 F.3d 1075, 1089 (Fed. Cir. 2009) (rejecting a construction that was "no

more or less clear" than the term 'real-time' itself, as it was "unhelpful in ascertaining the

meaning of 'real time'").

Second, nothing in the '658 Patent claims, specification, or prosecution history limits the

"network" to either a "real-time computer network" or a "network including a real-time

computer network."  As noted, "real-time" appears only twice in the Patent, as a description of

the benefits of a non-limiting example of the invention.  Doc. 45-1 at 12 (5:56-6:3).  Indeed, in

one preferred embodiment described in the specification, "the network may take the form of

voice communication (e.g., through telephony or by face-to-face encounter) or an electronic

interconnection such as an Internet or intranet Web browser interface, or any wireless or direct interface assisted by a software component such as a client-side application." *Id*. at 14 (9:25-30). A network that "take[s] the form of voice communication" by a face-to-face or phone conversation is neither a "real-time computer network" nor necessarily a "network including a real-time computer network." The preferred embodiment in the specification thus undermines Mantissa's proposed construction. *See On-Line Tech. v. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1138 (Fed. Cir. 2004) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct.") (quotation omitted).

To support its view, Mantissa argues that the specification's explanation that the invention is "in the context of the Internet, which is a real-time computer network," establishes that the term "network" denotes a real-time computer network. Doc. 46 at 23. However, the portion of the specification cited by Mantissa states only that, "[w]ith the increased technical and Internet literacy of our culture … there is a need for a system to protect the identity of an entity from misuse at a more fundamental level." Doc. 45-1 at 10 (1:38-50). Thus, while the specification's reference to the Internet describes the environment that makes the invention necessary, it does not suggest that the invention itself necessarily utilizes the Internet or any other "real-time network." Mantissa's related argument—that a statement in the prosecution history that the "subject matter of the pending claims … overcome[s] problems specifically arising in the realm of computer networks … [such as] the Internet" establishes that "network" means a "real-time computer network"—is unpersuasive for the same reason. Doc. 46 at 23-24. That the invention addresses problems created by the Internet does not necessarily mean that the invention itself utilizes "real-time computer networks."

As there is no support for construing the term "network" as a "real-time" network, the court declines to do so. In addition, the specification's description that a preferred embodiment of the invention could include a network that "take[s] the form of voice communication" by a face-to-face or phone conversation is convincing evidence that the term "network" does not describe a system that necessarily includes only computers. Rather, the network could include a combination of "telephony or [] face-to-face encounter" and communication among computers, as Fiserv acknowledged when it agreed at the claim construction hearing to a construction defining the term "network" as *including* computers. Accordingly, removing the phrase "real-time" from and slightly modifying Mantissa's alternative proposal, the court construes the term "network" to mean: "A network that includes computers."

### B. First-level claim steps of "receiving," "comparing," "determining," and "responding"

Mantissa proposes construing the first-level claim steps of "receiving," "comparing," "determining," and "responding" as being "performed in real-time or near-real-time and using computer communication network protocols" or, alternatively, as being "performed together in real-time and using computer communication network protocols." Doc. 46 at 28-29. As noted, Mantissa cites no evidence that meaningfully defines "real-time," and that phrase's inclusion in a construction of the first-level claim steps thus would create additional and unnecessary confusion as to the terms' meanings. Nor does Mantissa point to any evidence, besides the two mentions of the phrase "real-time" in the specification discussed above, indicating that the terms are limited to "real-time" performance. There accordingly is no basis for construing the first-level claim step terms as being "performed in real-time or near-real-time" or "performed together in real-time."

28

The parties agree, however, that, "[i]n each asserted claim, the first-level claim steps of 'setting' (or 'storing' in claim 13), 'receiving,' 'comparing' (only in claim 13), 'determining,' and 'responding'" are "performed by execution on computer(s) of the 'service provider' and in the order stated in the claim." Doc. 49 at 1. The parties thus agree that the first-level claim steps are performed "using computer communication network protocols." In addition, the parties agree that the steps are performed in sequence, rather than "together," which conforms to Mantissa's original proposal. Accordingly, removing "real-time" from Mantissa's original proposal, the court construes the first-level claim step terms of "receiving," "comparing," "determining," and "responding" as being "performed using computer communication network protocols."

### III. "Setting" (claims 1, 7, 11, and 15)

Mantissa proposes construing the term "setting" as "[s]toring in the computer(s) of the service provider." Doc. 46 at 21-22. Fiserv contends that no construction is needed, as "[t]he term 'setting' is not technical in nature and would be readily understood by a jury." Doc. 44 at 17. The parties agree that the "setting" step is performed on the service provider's computer(s). Doc. 49 at 1; Doc. 44 at 17. Thus, the parties' dispute concerns only whether the term "setting" is clarified by construing it to mean "storing." It is not.

Claims 1 and 7 state that the service provider performs the step of "setting [the] scope of use … for the financial account, including at least" whether the financial account is OFF or ON, whether a "plurality of categories" is authorized or unauthorized, and the geographic area in which transactions are authorized. Doc. 45-1 at 17 (15:23-31, 16:17-28). According to Mantissa, "setting" must mean "storing" because, to be defined in a computer, the scope of use "must be represented by data which is typically stored by computers in memory of computers." Doc. 46 at 21. But "to set" is commonly used to refer to fixing preferences, *see Set*, Merriam-

Webster Dictionary Online (def. 10), https://www.merriam-webster.com/dictionary/set ("to fix or decide on as a time, limit, or regulation"), and a layperson would understand that "setting" an account to "off" on a computer application means storing that preference in the computer's memory, just as a person of ordinary skill in the art would.  *See Phillips*, 415 F.3d at 1314 (holding that, when "the ordinary meaning of claim language as understood by a person of skill in the art [is] readily apparent even to lay judges, … claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words"); *Brown*, 265 F.3d at 1352 (noting that claim terms that "are not technical terms of art" generally "do not require elaborate interpretation").  Although Mantissa suggests that a jury might think that "setting" "could be done in the mind," Doc. 46 at 22, the parties agree that "setting" is "performed by execution on computer(s) of the 'service provider,'" Doc. 49 at 1, thereby precluding a jury from erroneously concluding that "setting" is performed "in the mind."

Because construing the term "setting" to mean "storing" would make the term's meaning less clear, the court declines to do so.  *See U.S. Surgical Corp.*, 103 F.3d at 1568 ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court.  Claim construction is [used] … to clarify and when necessary to explain what the patentee covered by the claims … .  It is not an obligatory exercise in redundancy."); *see also AstraZeneca*, 19 F.4th at 1342 (Taranto, J., dissenting in part) ("One problem with [the party's] proposed … construction is that … it actually adds to the uncertainty of claim scope compared to the ordinary meaning.  Such a construction works against the core purpose of claim construction, which is to *clarify* claim scope.").  And because the parties agree to a construction of the first-level claim steps, including "setting," as being "performed by execution on computer(s) of the 'service provider,'" Doc. 49

at 1, there is no need to adopt the second part of Mantissa's proposed construction—that "setting" is performed "in the computer(s) of the service provider." *See Vanderlande Indus. Nederland BV v. I.T.C.*, 366 F.3d 1311, 1323 (Fed. Cir. 2004) (holding that there was "no reason for the ALJ to set out a formal construction" when a "claim limitation was not in dispute"); *see also Haberman v. Gerber Prod. Co*., 236 F. App'x 592, 600 (Fed. Cir. 2007) ("[W]hen the parties do not dispute the claim language … the district court is not required to add an additional layer of complexity by 'constructing' the words of the claim merely to reiterate those words in a jury instruction.").

Accordingly, no construction of the term "setting" is needed.

**IV.    "Responding to the inquiry by providing, via a network to the source, first information" and "Responding to the request by providing, via a network to the source, response information" (claims 1, 7, and 13)**

Mantissa proposes construing these phrases as "[s]ending first/response information directly or indirectly via a network to the source."  Doc. 46 at 27-28.  Fiserv initially argued that no construction was required, reasoning that the phrases "should be given their plain and ordinary meanings."  Doc. 44 at 18.  However, at the claim construction hearing, the parties agreed to the following construction: "sending, in response to the inquiry/request, first/response information directly or indirectly via a network to the source."  Doc. 63.  Accordingly, the court construes "responding to the inquiry by providing, via a network to the source, first information" (claims 1 and 7) to mean: "sending, in response to the inquiry, first information directly or indirectly via a network to the source."  And the court construes "responding to the request by providing, via a network to the source, response information" (claim 13) to mean: "sending, in response to the request, response information directly or indirectly via a network to the source."

**Conclusion**

For the foregoing reasons, the court construes the six disputed claim terms as follows:

31

**Table 5. Construction of Disputed Claim Terms**

| Disputed Claim Term | Court's Construction |
|---|---|
| "service provider" (claims 1, 3, 7, 8) | That which addresses requests for use of an entity's financial account. |
| "source" (claims 1, 7, 13) | A person or thing from which the inquiry comes into being or is derived or obtained. |
| "network" (claims 1, 7, 13) | A network that includes computers. |
| In each asserted claim, the first-level claim steps of "receiving," "comparing" (claim 13 only), "determining," and "responding" | Each step is performed using computer communication network protocols. |
| "setting" (claims 1, 7, 11, 15) | No construction needed. |
| "responding to the inquiry/request by providing, via a network to the source, first/response information" (claims 1, 7, 13) | Sending, in response to the inquiry/request, first/response information directly or indirectly via a network to the source. |

July 5, 2022

_____

United States District Judge